CRUCIBLE STEEL CASTING COMPANY, PETITIONER, *v.* THE SECRETARY OF THE NAVY, RESPONDENT.

Docket No. 13–R. Promulgated September 30, 1947.

*Vernon L. Stover, Esq.*, for the petitioner.
*Frederick N. Curley, Esq.*, for the respondent.

528

**OPINION.**

Harlan, *Judge*: Petitioner contends that it received no "excessive profits" in 1942 as those profits are defined by section 403 (a) (4) (A) of the Renegotiation Act. This section requires that certain factors in the taxpayer's conduct of his business shall be taken into consideration in the determination of the question of the reasonable or excessive nature of the profits involved.

The first factor is a consideration of efficiency in production. In order to establish its efficiency, petitioner referred to the long hours and heavy responsibilities of its officers. The added responsibility was, of course, the natural consequence of the increased war production load and the training of new personnel. To compensate for these added responsibilities, however, all of the officers received very substantial pay increases in 1942 over the prewar schedule, the compensation in 1942 being roughly four times that received in 1939. The overtime work by the officers would also seem to be adequately compensated for, but the existence of this work might be just as persuasive of inefficiency as the reverse, since it might be argued that, instead of a fourfold increase in salary, an increase in staff and a division of responsibility might have resulted in greater efficiency.

It was also contended that in peacetime production 2 per cent rejections are expected, whereas petitioner in its production for the Government had but three-fourths of 1 per cent rejections. However, this difference could be accounted for by the greater duplication of Government castings over those used by industry generally; by the presence of a Government inspector on the job; and by the great increase in the duplication of castings with each order. We heard no testimony as to whether or not petitioner's rejection percentage differed in any way from the record of rejections of other producers of similar products. Furthermore, there was no testimony that any efficiency developed by petitioner resulted in either better products, more rapid delivery, or lower prices to the Government than occurred with competing producers.

The second factor of production set out by the Renegotiation Act is reasonableness of costs and profits, having regard to volume of production and prewar earnings. During 1942 petitioner charged OPA ceiling prices. In 1943 OPA made a complete survey of the steel casting business and as a result thereof declared that the 1942 prices were too high by 10 per cent and accordingly reduced the ceiling prices by that amount. Such reduction, if it had been applied to petitioner's sales in 1942, would have reduced its income from sales to the Government during that year by $155,088.60. Such a reduction would probably be unwarranted in 1942, because of the added expense incurred by the taxpayer in expanding its equipment and personnel during that year. However, petitioner has not shown what percentage of its sales dollar was consumed by the cost of expansion in 1942. Most certainly a large portion if not all of that cost would be absorbed by the economy of larger production and the increased duplication of units per order. During normal years petitioner's profit per casting was 8.03 cents. In 1943, with a fivefold increase in volume, petitioner's net profit per casting was 75.12 cents. The effect of increased volume on cost and profit is reflected by the remarks of the Court in *Aircraft Screw Products Co.*, 8 T. C. 1037, wherein the Court said:

\* \* \* Even if it could have been reasonably anticipated that labor or other costs would increase, we think it could have also been anticipated that such increased costs would be offset by the gain from reduced unit cost of manufacturing incident to the increased production so that its percentage of profit on net sales would be maintained and, at least since its prices were not reduced, that it would realize a substantially larger amount in net profits from its operations than in the prior year.

Petitioner's brief contains the following:

The amount of gross sales subject to renegotiation represents about 79% of the total sales for the calendar year. The remaining 21% being work for others than agencies of the Federal Government. The net profit too results in about 79%. In other words, about 79% of the net profits of the Corporation resulted from work done as subcontractor for customers having Governmental work.

The above statement, of course, would follow the practice of charging both the Government and the private consumer ceiling OPA prices, yet the volume of Government production was almost four times that of private industry, and with the former no sales effort was needed, the payments were prompt and assured, priorities were expedited, and there was much more duplication. It would seem that the percentage of profits in Government work should be considerably less than with private customers.

The next factor for consideration is the use of public and private capital by the producer and the producer's net worth. During 1942 petitioner borrowed no funds from the Government, but did borrow $15,000 from private sources. Whether or not that $15,000 was borrowed to finance petitioner's private or its public business is not shown.

Furthermore, petitioner purchased $145,800 of new equipment which was completely depreciated during the war and before the end of 1945. Just how much depreciation was taken in 1942 is not shown, but we do know that the whole amount was amortized in four years and that at the end of the war the petitioner possessed all of this equipment completely charged off to the cost of production of Navy castings and that after four years' use the evidence indicates it had many years of valuable service.

Petitioner's net worth at the beginning of 1942 was $306,876. Its profits on its private and its public business were $314,180, of which $247,579 was on renegotiable business. An expert witness, testifying for the Government after making a survey of the composite report of 72 companies producing 67 per cent of our tonnage of steel castings, showed the ratio of profits to net worth for the industry generally. This testimony was not contradicted by petitioner, except to the extent that petitioner asserted that some of the companies reporting were very large companies engaged in heavy steel casting work, such as parts for railroad rolling stock and armor plates. However, petitioner produced no evidence to indicate that its ratio of profit should be larger than the ratio of profit of other steel casting companies. The ratio of profits to the net worth of petitioner and the net worth of the industry generally is as follows:

| Year | Petitioner | 72 companies |
|------|-----------|--------------|
| 1936 | 0.065 | 0.057 |
| 1937 | .202 | .103 |
| 1940 | .31 | .142 |
| 1941 | .865 | .402 |
| 1942 | 1.028 | .71 |

From the above it appears that the ratio of petitioner's profits in 1942 to its net worth for that year is considerably out of line with the industry generally.

The next production factor to consider in ascertaining excessive profits is the extent of risk assumed by the producer. The net profit per casting during the 3 years of the so-called normal prewar period, eliminating 1938, which was a loss year, is as follows: 1936, $.0198; 1937, $.1860; and 1939, $.2107. Thus, petitioner's average peacetime profit per casting was $.1388. In 1942 it was $.7512 per casting, or petitioner enjoyed a safety factor in 1942 5.4 times as great as it had in its 3 profit prewar years. In addition, petitioner in 1942 had the United States Government for a debtor.

Our next two considerations pertain to petitioner's contribution to the war effort, its inventive and development work, and the complexity of its production. It is stipulated that petitioner's products were satisfactory both in quality and quantity. It did a good job in our industrial army just as many million individuals did in a military way. It had no patents. It used substantially the same manufacturing process employed by others in steel casting work. Its work was comparatively unimaginative, was uncomplicated, and was of the same general type performed by it both before and after the war.

Other factors which might be considered embrace loss at conversion into and out of war work, loss of private customers during war work, and conditions of the market caused by war work injurious to peacetime production.

Petitioner, on engaging in war production, used its former plant. It merely purchased additional equipment, which it quickly depreciated. It retained its former private business, and in fact it greatly increased that business in 1942 over its normal peacetime volume. On its reconversion to peacetime activities, it was not required to expend any money. It merely continued to produce the same general type of product which it had produced during the war. There was no problem of retooling. In fact, it was in a far better position because of equipment purchased during the war than it was at the beginning of hostilities. Unlike many industries, the war work of petitioner did not supply the Government with great quantities of surplus property which could be dumped on the market to interfere with petitioner's normal market demands. In fact, its experience in producing for the Navy during the war placed it in a position to obtain postwar work for the Navy which it did not formerly enjoy.

Because of the above considerations, it is our conclusion that the profits realized by petitioner in 1942 were excessive within the meaning of the definitions set forth in section 403 (a) (4) (A) of the Renegotia-

tion Act. In deciding the extent of that excessive profit, we have given consideration to the testimony of an expert employed by the Government in connection with all the other evidence. The petitioner introduced no evidence to contradict the testimony of this expert witness and only argued against its conclusiveness by the statement that the witness had not visited petitioner's plant and had used some profit figures pertaining to types of steel casting business somewhat unlike that of petitioner. However, petitioner did not submit any figures of its own showing the situation as to the type of steel casting production in which it was specifically engaged. Our conclusion is that a reasonable net profit for petitioner, when considered in the light of profits in similar industries generally in 1942, would be $97,500.

Petitioner's income tax return for 1942 is not in evidence, nor have we been presented with any analysis of the relation of petitioner's taxes to its income. However, petitioner, in its brief, argues earnestly on this point and the arguments raised would have considerable appeal to any court if substantiated by evidence and if the period involved were not a war period. The emergency Court of Appeals was presented with a similar situation and a similar argument in the brief in *Interwoven Stocking Co.* v. *Bowles*, 141 Fed. (2d) 696, wherein the court says of such a contention:

> The contention is wholly without merit. If it were accepted the complainant would be accorded the right to escape its share of war-time taxation by passing the burden of its taxes on to its customers in the form of increased prices for its hosiery. Certainly neither the Constitution nor the act accords to the complainant any such unique tax exemption.

We have also examined the reported decisions of renegotiation cases before this Court and have found none in which this Court computed the allowable profits after taxes. All of the computations were made before taxes, independent of the tax results.

We therefore conclude that petitioner's profit for 1942 was excessive in the amount of $97,500.

Reviewed by the Court.

*An order will issue in accordance with the above.*

---

ARUNDELL, *J.*, dissenting: I see no reason in the facts found to justify increasing the excessive profits of the petitioner from the amount of $80,000 determined by the respondent to $97,500, and I therefore dissent.

MURDOCK, *J.*, agrees with this dissent.